No. 25,879.

THE STATE BANK OF PECK, L. C. KELLEY, and H. J. KLASSEN, *Appellants*, v. B. E. MORSE et al., *Appellees.*

SYLLABUS BY THE COURT.

1. CONTRACTS—*Sale of Bank Stock—Interpretation of Supplemental Contracts.* In a written contract for the sale of bank stock the sellers guaranteed payment of the notes on hand, with a provision that they should be automatically relieved from liability upon any notes which should be renewed. Later they signed supplemental contracts authorizing the renewal of certain notes for a specified time. It is held that the supplemental contracts should as a matter of law be interpreted as authorizing a renewal of the notes without a release of the liability as guarantors which the sellers assumed in the original contract, and that the evidence introduced had no tendency to justify a different construction.

2. BILLS AND NOTES—*Release of Guarantor—Question of Fact.* A question whether guarantors of a note were released by want of diligence on the part of the holder is held to have been one of fact on which the verdict is final.

3. MASTER AND SERVANT—*Compensation—Evidence.* The evidence is held to justify a finding that the account books of a bank showed an indebtedness to its cashier for salary.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed July 11, 1925. Reversed.

*L. H. Finney* and *W. T. McBride,* both of Wellington, for the appellants; *S. B. Amidon, S. A. Buckland, H. W. Hart, Glenn Porter* and *Enos E. Hook,* all of Wichita, of counsel.

*E. J. Taggart, John Bradley,* both of Wellington, *A. L. Noble, W. A. Ayres, Hal M. Black* and *C. A. McCorkle,* all of Wichita, for the appellees.

The opinion of the court was delivered by

MASON, J.: On December 14, 1920, B. E. Morse and Elma M. Morse, owners of a majority of the stock in the State Bank of Peck, sold it to L. C. Kelley, a written contract being entered into by which they guaranteed the collection of the bank's bills receivable. The present action was brought against them on their guaranty by the bank, Kelley, and H. J. Klassen, to whom Kelley had transferred his rights. The plaintiffs appeal from so much of the judg-

1. Guaranty, 28 C. J. § 162. 2. Id., 28 C. J. §§ 205, 207. 3. Banks and Banking, 7 C. J. § 129; Master and Servant, 26 Cyc. p. 1061.

ment as denied them a recovery with respect to five notes held by the bank, and also from a ruling upon a different matter, to be stated later.

1. So far as relates to four of the five notes referred to, the decision turns upon the effect to be given to a series of four writings executed by the defendants on December 29, 1920, April 15, 1921, and May 7, 1921. The original contract contained a provision that if within a year the bank renewed any of the notes guaranteed such renewal should automatically relieve the defendants from any liability with respect to them. The writings afterward signed by the defendants stated that they authorized the bank to renew certain specified notes, among which the four now under consideration were included. If these subsequent agreements had the effect of preventing the renewals so authorized from operating to release the defendants from liability as guarantors of the notes to which they referred, then the judgment rendered was erroneous; otherwise it must stand.

The original contract, so far as here important, reads:

"As a part of the consideration for this sale, said B. E. Morse and Minnie Morse hereby guarantee to said L. C. Kelley the collection by said State Bank of Peck of each and all of the bills receivable of the said State Bank in the following manner, said bills receivable being those in said State Bank at time of change of management, as hereinafter set out, that is to say: If during the time of one year from the date hereof the officials of the State Bank of Peck renew any one or more or any part of any one or more of the said bills receivable, then automatically such renewal will relieve said Morse and Morse from any liability thereafter on account hereof on said paper so renewed."

The writings authorizing an extension of time upon the four notes here involved were substantially alike, one of them reading:

"Peck, Kansas, May 7, 1921. As per our contract dated Dec. 14, 1920, with L. C. Kelley of Wichita, Kans., we hereby authorize the State Bank of Peck, Peck, Kansas, to renew for 90 days the S. D. McCabe notes No. 15278 and 15276 for $1,153.00 and $2,000.00, respectively. New notes for $1,000.00 and $2,000.00 to mature August 6, 1921.—B. E. Morse, Minnie Morse."

The trial court instructed with respect to these supplemental contracts that "the natural presumption would be that they were executed for the purpose of permitting the bank to make renewals of the notes in controversy without releasing the defendants from further liability in accordance with the terms of the original contract"; but that they were vague, indefinite and ambiguous, and oral testimony had been offered to enable the jury to determine what was in fact the understanding and intention of the parties at the time

of their execution. The jury were also told that they were "to determine from all the facts and circumstances what the intentions of the parties were at the time of their execution, as to the continuation of the defendants' liability upon the notes to which such supplemental contracts refer. . . ." And that "the intention of the parties must be gathered from all the facts and circumstances, and that the mind of the officer representing the bank, and the defendants' minds, met upon the effect of such contract. That is, that they each intended that the liability of the defendants should continue after the renewal. If they did so intend then the plaintiff is entitled to recover; if they did not so intend the plaintiff cannot recover."

In the judgment of this court the supplemental contracts, considered, as they must be, in connection with the original agreement, contain no ambiguity requiring clarification by oral evidence, but plainly mean upon their face that the bank was at liberty to make the extensions referred to, without the liability of the guarantors being thereby affected. It is true that they do not expressly say, as they might have done, that such extensions should not relieve the signers from liability, but that implication clearly follows from the nature of the case. The bank of course had the power to extend the notes at its pleasure, as between itself and the makers, but it could do so and at the same time preserve its remedy against the defendants only by obtaining their agreement that such result should not follow. The fair interpretation of their authorization of an extension of the time of payment of a particular note is that they agreed it might be granted without the consequences to them which would follow if it were made without their authority.

Nor do we see that the evidence tended to warrant any other interpretation of the supplemental agreements than the one indicated on their face. In the defendants' brief it is said, "We may concede that these subsequent writings were more or less of an idle ceremony." Defendant B. E. Morse testified that the consents to renewal were just a formal matter. The natural presumption being, as the trial court said in his charge to the jury, that the supplemental contracts were executed to permit the bank to make renewals without releasing the defendants from liability, the contention that they were meaningless and without legal effect is not tenable. The original contract contained a provision that the defendants would do whatever in reason they could to assist the bank in the future. The suggestion is made that, in view of this, the defendants' signing of

State Bank v. Morse.

the statement that they authorized the renewal of a particular note is open. to interpretation as meaning that they recommended that course. We cannot regard the language as open to that construction.

According to the defendants' evidence the matter of renewals was first broached to them by a request from the bank to sign a writing like those under consideration. B. E. Morse said he would not sign it until he had consulted his attorney, and it was not signed. A day or so later he refused to sign a different paper presented to him by Kelley, reading:

"We the undersigned, B. E. M. & M. M., having sold our stock in the State Bank of Peck to L. C. Kelley, of Wichita, Kansas, and guaranteed the collection of the bills receivable of said bank under certain conditions as set forth in a contract dated 12-14-20, do hereby for value received consent that the State Bank of Peck and its officials may renew any note or notes covered by said guarantee, and said guarantee shall continue as to such notes so renewed exactly the same as if they had not been renewed."

It is suggested that the refusal to sign this second paper should be regarded as advising the plaintiffs that the defendants were unwilling to agree to an extension if they were to be still held as guarantors. The more obvious inference would seem to be that they were unwilling to agree to an extension of all the notes for whatever time the bank should see fit.

On April 18 and June 25, 1921, the defendants signed two supplemental contracts like those under consideration, which at the time of the trial contained respectively the additional phrases: "without releasing us from contract" and "the payment of which we guarantee." The defendants testified that the language quoted had been added after the execution, and the verdict implies a finding to that effect. It is suggested that the insertion of these words justifies the inference of an understanding by the bank that without them the supplemental contracts would not preserve their liability as guarantors of the notes after renewal. It might indicate that the bank was at least doubtful of the legal effect of the original language, but we do not see that a doubt on its part, or even a mistake, as to that matter, could change the fair and natural interpretation of the supplemental contracts now in question.

It results from these views that the court should not have submitted to the jury the question of the meaning of the written contracts, and that the jury placed a wrong interpretation on them. Inasmuch as we interpret the contracts as preserving the liability of the defendants with respect to the notes renewed by their authority,

there remains nothing to be tried so far as concerns the notes already considered.

2. The defendants claim to have been released from liability on the remaining note of the five involved in the appeal by the failure of the bank to use proper diligence in realizing on a chattel mortgage covering a stock of merchandise by which it was secured. The plaintiffs assert that the mortgage was executed in violation of the bulk-sales law and was void as to creditors because of the mortgagor continuing to sell goods in the ordinary course of business. Neither consideration would make the mortgage invalid between the parties (11 C. J. 571, note 57; *Harpham Brothers Co. v. Perry,* 118 Kan. 457, 460, 235 Pac. 1039), and the question whether the course pursued by the bank was such as to release the guarantors was one of fact as to which the verdict of the jury is final.

3. The original contract referred to also contained this clause:

"Said Morse and Morse further hereby individually guarantee, as a part of this sale to the said Kelley, that the account books, stock books, general balance account, and all other records of said State Bank showing its condition, are exactly as they appear and are correct at the time that the management of the said State Bank is turned over, on or before Dec. 19, A.D. 1920, to the said L. C. Kelley, as hereinafter set forth."

B. E. Morse was cashier of the bank prior to the change in management, which took place about the time the contract for the sale of stock was entered into. On December 17, 1920, he drew from the bank $300 as his salary for three months. The plaintiffs ask judgment on account of this item of $300, concerning which they say:

"We purchased the bank on a certain date, and after the examination I asked Morse for his resignation according to the contract; I went to Peck one day and found that Morse had drawn $300 salary after we had taken the bank over, after he was no longer employed in the bank only to help a few days."

There was testimony that the cashier had received but $500 for his services from July 9 to December 14, 1920, and these entries were shown on the expense account: "Voucher No. 6860, October 7th, B. E. Morse salary, July 9th to August 9th, '20, $100. Voucher 6874, October 20th, B. E. Morse, 8-9-20 to 10-9-20, $100. December 17th, Voucher 6932, B. E. Morse salary, 3 months, $300." The figures "10-9-20" appear to have been intended for "9-9-20." Considered as a whole, the entries sufficiently show the cashier was drawing a salary of $100 a month and had been paid for his services only until September 9, and therefore the bank owed him $300.

The judgment is reversed and the cause remanded with directions:

to add to the amount of the plaintiffs' judgment the sums owing upon the four notes first discussed, of which the defendants authorized a renewal.